Richard COSIO, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–1906, 02–CO–1453.

District of Columbia Court of Appeals.

Argued April 8, 2004.
Decided July 8, 2004.

Paul Y. Kiyonaga, with whom Debra L. Soltis was on the brief, for appellant.

Leah L. Belaire, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney were on the brief, for appellee.

Before SCHWELB and REID, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior J.

A jury convicted Richard Cosio of taking indecent liberties with a minor child, car-

nal knowledge, three counts of first degree child sexual abuse, and three counts of second degree child sexual abuse. D.C.Code §§ 22–3501(a), –2801 (1981); *id.,* §§ 22–4108, –4109 (1996 repl.).[1] In his direct appeal from these convictions, Cosio contends that the trial court abused its discretion in excluding a medical record of a physical examination of the complainant. After his conviction, Cosio filed a *pro se* motion under D.C.Code § 23–110 (2001) alleging ineffective assistance of counsel, which the trial court denied without prejudice. When later represented by counsel, Cosio filed a second § 23–110 motion on the same issue, which the trial court denied after a hearing on the merits. We consolidated Cosio's appeal from the denial of his second § 23–110 motion with his direct appeal and, after reviewing his arguments, affirm all convictions.

**I.**

Cosio's convictions were attributable to his relationship with his half-sister, the complainant A.A. In 1990, when Cosio was eighteen and A.A. about seven years old, they lived with their mother and three other siblings in an efficiency apartment. A.A. testified that Cosio would hit her and her siblings, and she specified at least one incident during 1990 when Cosio sexually abused her. A.A. testified that she had been afraid of Cosio during this time period, which lasted approximately one year, and that she also had been afraid that her mother would not believe her if she told her mother what had happened. A.A. left to attend a boarding school for a few years, but returned to live with her family in 1993 or 1994. She testified that Cosio began to sexually abuse her again in 1994,

1. Effective May 23, 1995, the crimes of taking indecent liberties with a minor child and carnal knowledge were incorporated into the definitions of first and second degree child sexual abuse. Because the charged acts of abuse took place both before and after May 23, 1995, separate counts as to each were charged, and submitted to the jury, under the statutory provision in effect at the time of each alleged incident.

when she was eleven. A.A. said that this abuse, which included Cosio's putting his penis in her vagina, occurred more than once a year between 1994 and 1997 (by which time A.A. was fourteen years old). The last incident was alleged to have occurred in October 1997 around the time of Cosio's birthday.

After A.A. came home from boarding school she had remained silent about the renewed abuse, she said, because she had been "too afraid" of Cosio, meaning she believed that he might "go insane." During 1997, however, when A.A. was in eighth grade, she met two lawyers—a husband and wife—who tutored her for school and eventually gained her trust. A.A. testified that she had revealed the abuse to the lawyers in November of that year because she hoped that "they could try to find [her] help."

After disclosing the abuse, A.A. went to a hospital and was interviewed by the police. On December 15, 1997, Dr. Beverly Lindsay, a pediatrician in the Division of Child Protection, examined A.A. at Children's Hospital. Dr. Lindsay was qualified at trial as an expert in pediatrics, child sexual abuse, and child sexual abuse examinations. Dr. Lindsay testified that her examination revealed an injury to A.A.'s hymen that was consistent with sexual abuse.

As his first witnesses, Cosio called two of his coworkers to testify solely as character witnesses. Jose Garcia and Nora Carnathan both testified that Cosio had a "good reputation" and was a "law abiding person." Cosio next called Dr. John Adams, a forensic pathologist, who testified about the details of Dr. Lindsay's examinations. Cosio sought to introduce through Dr. Adams the medical record of a 1993 examination of A.A. (believed to be a routine physical required by A.A.'s school). The record included a line for "genital/urinary" on which the examining doctor had checked a box labeled "normal." After a voir dire examination covering Dr. Adams's qualifications and what his testimony about the 1993 record would be, the trial court ruled that Dr. Adams was not qualified to testify about the record, and that in any event the record was inadmissible.

## II.

In his § 23–110 motion and again on appeal, Cosio argues that A.A.'s alleged fear of him—proffered by the government as a major reason why A.A. had failed to report the alleged sexual abuse until late 1997—was an issue of central importance to the government's case. He maintains that his trial counsel's failure to rebut the evidence purporting to establish this fear was a deficiency in performance so prejudicial to his defense that the assistance he received from counsel was constitutionally ineffective.

### A.

In order to prevail on a claim of ineffective assistance of counsel, Cosio must show that (1) his trial counsel's performance was "deficient," meaning that the defaults were "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment"; and that (2) counsel's deficient performance so prejudiced the defense "as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hill v. United States,* 489 A.2d 1078, 1079 (D.C.1985). This court's "scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." *Id.* at 690,

104 S.Ct. 2052. Furthermore, even if counsel's representation was deficient, Cosio must show enough prejudice that a reviewing court would have to conclude that, but for trial counsel's deficiency, there is a "reasonable probability" that the result would have been different. *Id.* at 694, 104 S.Ct. 2052; *Hockman v. United States*, 517 A.2d 44, 51 (D.C.1986).

There can be no question on this record that A.A.'s alleged fear of Cosio played a central role in the government's case, as the following pretrial and trial events make clear. The acts giving rise to Cosio's convictions occurred while A.A. was between eleven and fourteen years old, but the government filed a notice of intent to introduce evidence of earlier, uncharged misconduct, as permitted by *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964) and Super. Ct.Crim. R. 12(c) ("*Drew* notice"). The *Drew* notice revealed that the government expected to show by clear and convincing evidence that Cosio had sexually and physically abused A.A. in 1990 and 1991 when she was seven and eight years old. The notice explained that this evidence was admissible for two reasons: first, to show Cosio's "unusual sexual preference," *see Dyson v. United States*, 97 A.2d 135 (D.C.1953); and second, to place the charged conduct in an understandable context, *see Johnson v. United States*, 683 A.2d 1087 (D.C.1996) (en banc). The prior physical abuse, argued the government, had "made [A.A.] fear [Cosio] and discouraged her from disclosing his acts of sexual abuse sooner." According to the *Drew* notice, therefore, A.A.'s trial testimony about the earlier instances of abuse was necessary to rebut any importance the jury might place on the absence of contemporaneous reports of the abuse by A.A. Cosio's trial counsel did not object to this evidence until the morning of trial, more than four months after the *Drew* notice was filed. As a result, the trial court ruled that the objection was untimely and thus had been waived.

During his opening statement, the prosecutor referred to A.A.'s fear of Cosio three times. Then, before addressing the specific facts of A.A.'s case, Dr. Lindsay, the prosecution's expert, testified that it was typical for a child not to disclose sexual abuse immediately both because she feels threatened and because she may not have a trusted adult in whom she feels comfortable confiding. Next, A.A. testified that she had not reported the sexual abuse, both when she was seven and eight and later from ages eleven to fourteen, because she had been "afraid" of Cosio. Finally, the prosecutor also mentioned A.A.'s fear of Cosio in the government's closing argument and again in rebuttal closing argument.

Relying on A.A.'s and Dr. Lindsay's testimony, the prosecutor also offered the jury several other theories as to why A.A. had delayed in reporting the abuse: (1) A.A. had not told schoolmates or teachers because she wanted to try to forget about what had happened and have a normal life; (2) A.A. may have thought that no one would believe her; and (3) A.A. may have been embarrassed or ashamed. The prosecutor's central reason for the reporting delay, however, was A.A.'s fear of the consequences from Cosio.

**B.**

Cosio acknowledges that his trial counsel conducted an extensive pretrial investigation, including interviews with Cosio's mother, brothers, sister Elizabeth, friends, school teachers, and coworkers. But he faults the questioning of Cosio's coworkers that failed, he says, to reveal a powerful refutation of the government's evidence that A.A. feared Cosio. Attached to the § 23–110 motion were affidavits from four

coworkers who averred that A.A. had frequently visited Cosio where he worked, at International Data Processing (IDP), and that the two had appeared to have a "comfortable," "friendly," even "affectionate" relationship. Two of the affiants—Jose Garcia, who testified for Cosio at trial as a character witness, and Henry Estrada, a fellow employee who had not testified— also averred that they had spoken with trial counsel or his investigator but had been asked only about Cosio's moral character, not about the nature of his relationship with A.A. At the § 23–110 hearing, four coworkers (three of whom had given affidavits as well as one who had not) said they could have testified at trial that A.A. would visit Cosio at work, and that the two of them appeared to have a "normal," "comfortable," and "friendly" relationship. Coworker Santos Rafael Villatoro testified that A.A.'s sister Elizabeth also worked at IDP, and that their brother, Dennis, as well as their mother would also spend time at IDP visiting Cosio.

Evidence produced on trial counsel's behalf at the § 23–110 hearing established that four days after counsel had first met with Cosio, counsel had sent a memo to his investigator directing him, among other things, to investigate the nature of the relationship between Cosio and A.A., between A.A. and her family, and between A.A. and her tutor. The evidence also showed that Cosio had provided trial counsel with the names of many of his coworkers, a number of whom faxed statements to counsel in support of Cosio's general good character. (After the guilty verdicts, but before sentencing, two coworkers also wrote letters to the trial judge that included remarks describing how Cosio's relationship with his mother was dysfunctional.) None of these statements from coworkers mentioned Cosio's and A.A.'s relationship with each other, except to point out generally that Cosio was concerned about the welfare of his family.

Cosio's trial counsel testified at the hearing that although he had recognized that A.A.'s alleged fear of Cosio was an important issue, he had thought that the paramount concern was finding a reason why A.A. made the allegations that she did, in order to support a fabrication defense. Counsel also noted that the coworkers had informed him that Cosio's mother was obsessive, that she would wait for him outside his place of employment for hours, and that A.A. seemed immature to them. From this testimony, therefore, we can be sure that trial counsel at least was aware that the coworkers had had a glimpse of the family's dynamics—indeed, they had observed A.A. and may even have had some sort of interaction with her. On the other hand, the record does not indicate that trial counsel was informed by Cosio or by anyone else that any of Cosio's co-workers had ever had ample opportunity to witness interactions between Cosio and A.A. Nor, according to trial counsel, had he received before trial any information from coworkers as to whether A.A. feared Cosio. (On the other hand, he acknowledged that he had not instructed his investigator to inquire of Cosio's fellow employees about his relationship with A.A.) Trial counsel testified, in summary:

> [I]n a case like this ... it's almost ... assumed ... that I would investigate the relationship between [A.A.] and Mr. Cosio ... it is just implicit in this type of case that we're going to do that. And there [were] documents that I saw where [the investigator] asked questions ... with regard to that issue to other witnesses, including family members [and A.A.'s sister's friends] ... so I believe that—that issue was investigated, but that it wasn't my focus....

## C.

█ Cosio argues that coworker testimony about his "normal," "comfortable," "friendly," even "loving" relationship with A.A., if presented at trial, would have impeached A.A.'s credibility by substantially rebutting the prosecution's contention that A.A. had failed to report the abuse earlier because she was terrified of Cosio. We shall assume, for the sake of argument, that this testimony potentially would have been useful rebuttal evidence, as Cosio claims. But was counsel constitutionally deficient in failing to find out this information from Cosio's former employees before trial?

It is far from self-evident that, in order to meet the standard of performance required by the Constitution, counsel should have asked Cosio's coworkers whether they had ever seen A.A. and Cosio together at his workplace or elsewhere and, if so, what their relationship appeared to be. Coworkers are a logical source of information for evidence of good character; they are less easily thought of as sources of information about one's family relationships. Nonetheless, trial counsel here had been notified about the government's intention to show A.A.'s fear of her half-brother, and he also had learned that Cosio's coworkers had observed and perhaps even interacted with A.A. Under these special circumstances, then, would the most competent of defense counsel have considered Cosio's coworkers to be potential fact witnesses and raised family relationship questions with them? Probably yes. Although coworkers might not be a typical source of information about a colleague's family relationships, it at least is not unusual for some employees to share closely-held thoughts about personal relationships with friends they see every day at work. Furthermore, because several of Cosio's coworkers had volunteered at least some observations about A.A., it would have been logical for Cosio's lawyer to have followed up that information by asking how much his fellow employees knew about his relationship with A.A.

But how much would that pursuit have been likely to inform counsel and help the defense? Cosio almost certainly would not have shared information with co-workers tending to show that he was abusing his half-sister. On the other hand, any information he shared tending to show how much he cared for her would have been expected of a brother and thus of little, if any, real probative value on the "fear" issue. So the question narrows to whether trial counsel, to avoid constitutional deficiency, should have been expected to inquire of Cosio's coworkers, as possible fact witnesses, whether they had any objective information, based on personal observation, that would characterize the kind of relationship Cosio had with A.A.

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. The record of the § 23-110 hearing confirms that trial counsel did investigate the relationship between Cosio and A.A. by questioning the parties who had the greatest opportunity to witness it, namely, Cosio's and A.A.'s family and friends. The record also shows that the information gathered from these most obvious sources did not refute the government's evidence that A.A. feared Cosio. The coworkers' observations, therefore, if trial counsel had learned about them, would have been the best evidence Cosio could have found for rebutting A.A.'s alleged fear of him. Trial counsel is not helped by the fact that Cosio apparently failed to tell him that fellow employees would be able to confirm the good relationship he claimed to have with A.A. A client

should not be expected to anticipate the best defense and then volunteer every kind of information he or she has in support of it. It is the lawyer's job to ask the right questions of the client, and there is no evidence that trial counsel asked Cosio whether his coworkers could help establish important facts.

All this said, it is not at all clear that counsel's failure to pursue Cosio's coworkers as fact witnesses amounted to constitutionally deficient preparation. In the first place, trial counsel's basic strategy was a fabrication defense: motivated by resentment, A.A. made everything up to get out from under Cosio's persistent efforts to control her life—in particular, his efforts to prevent her from spending time with her lawyer-tutors, and especially with the male tutor, whom Cosio suspected of having a romantic connection with A.A. That defense would to some extent have been inconsistent with, or at least in tension with, a simultaneous defense effort to demonstrate (through the testimony of Cosio's fellow employees) that A.A. and Cosio had a close, friendly personal relationship—the kind of relationship necessary to rebut the government's contention that A.A.'s driving emotion was fear of Cosio.

Second, although the government did stress that A.A. had not reported her sexual abuse because she feared Cosio, other reasons for her failure to come forward were offered as well. A.A. testified that she had not told schoolmates or teachers because she wanted to try to forget about what happened and have a normal life. And the government's expert, Dr. Lindsay, testified that A.A. might have concealed the abuse because she was embarrassed or ashamed and, in any event, thought that no one would believe her. Thus, even the

suggested coworker testimony would not have entirely rebutted the government's "fear" argument; the deficiency of investigation was less telling than a failure to investigate would have been in another context where the government had no alternative basis for its contention.

Finally, coworker testimony that A.A. and Cosio appeared to have a normal, friendly, and comfortable relationship would not necessarily have been inconsistent with the government's emphasis on A.A.'s fear of Cosio. The government could have argued, with some force, that a young girl truly afraid of her half-brother would have acted friendly toward him around his coworkers lest she suffer cruel reprisals from him later for failing to convey the impression of a close relationship.[2] Had counsel put on the coworker evidence, therefore, the government would still have had a useful answer.

Despite trial counsel's having some information that Cosio's coworkers had seen Cosio and A.A. together on occasion, we shall assume for the sake of argument—in line with the position of Cosio's counsel on appeal—that trial counsel did not make a conscious, tactical choice not to interview Cosio's coworkers for evidence that might refute the government's "fear" argument. Thus, we shall assume that counsel did not, in fact, exercise the kind of conscious, professional judgment that a reviewing court, applying hindsight, should not second-guess. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.), *cert. denied*, 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 35 (1994). Nonetheless, given the inherent tension between (1) an effort to show a close relationship between A.A. and Cosio to rebut her alleged fear of him; and (2) an effort

---

**2.** Contrary to the dissent at 68, this argument does not necessarily presuppose a "statutory rape" situation.

to prove A.A.'s fabrication of the abuse charges based on substantial resentment of Cosio, particularly because of his efforts to keep her away from her school tutors, we can say that trial counsel made a "reasonable decision" to offer a fabrication defense that made "unnecessary" the "particular investigation[ ]" counsel on appeal now cites as an omission of constitutional dimension. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Or to explain the point in another way, suppose that trial counsel had, in fact, conducted a more thorough investigation of Cosio's coworkers, obtained all the information presented at the § 23–110 hearing, and then consciously decided not to use it out of a concern that the "close relationship" testimony might undermine the fabrication defense based on sustained resentment. *Strickland,* we believe, would have required us to defer to that judgment. If that is so, then the fact that trial counsel presented a fabrication defense without actually coming to grips with the available, additional evidence on the fear issue offers no principled basis for revising that conclusion. In sum, we cannot say that the performance of Cosio's trial counsel was so deficient that he "was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

From the foregoing analysis, it is apparent that trial counsel's alleged deficiency is premised on the claimed importance of the missing coworker evidence for the defense case. We are not ultimately persuaded of that importance. While not of merely marginal value, this missing evidence, all things considered, would not assuredly have been of major value to the defense. And as already noted, for tactical reasons counsel might well have withheld that evidence as counterproductive for a fabrication defense. In this case, therefore, the "deficiency" analysis blends with *Strickland's* "prejudice" analysis.

Of course, once we have concluded that there was no constitutional deficiency in performance, there is no basis for considering whether counsel's performance prejudiced the defense. *Id.* at 697, 104 S.Ct. 2052 (the court need not "address both components of the inquiry if the defendant makes an insufficient showing on one"). Nonetheless, we do not hesitate to add that Cosio has not met *Strickland's* standard for reversible prejudice. While there may have been a reasonable "possibility" that the result here would have been different if counsel had skillfully employed coworker testimony to rebut the government's "fear" theory while presenting, somewhat inconsistently, a fabrication defense, our review of the record convinces us that there was no reasonable *"probability"* of a different result, as *Strickland* requires for reversal. *Id.* at 694, 104 S.Ct. 2052 (emphasis added).

Trial counsel had a coherent defense: A.A. lied—a fabrication that counsel sought to prove not only through cross-examination of A.A. but also through admission of a 1993 medical record, buttressed by testimony from an expert witness, Dr. John Adams, tending to prove that A.A. had not been raped in 1990 (as she had claimed), and thus that she was a demonstrable liar. We cannot say that trial counsel's failure to add the coworker testimony, which might have undermined the "resentment" defense, created a trial deficiency prejudicial to Cosio's defense in violation of the Sixth Amendment.

### D.

Cosio's counsel on appeal asks us not to rest our decision on a perceived inconsistency between the coworker evidence that would tend to show a close, friendly relationship between Cosio and A.A. and a fabrication defense predicated on A.A.'s

resentment of Cosio. Appellate counsel puts a high premium on Cosio's lost opportunity to impeach A.A.'s testimony that she feared Cosio with highly credible testimony that the two were close. That rebuttal testimony, says appellate counsel, would have had a devastating impact on the government's case once the jury heard it. And, he argues, trial counsel could then have finessed the government's follow-up argument that Cosio was taking inconsistent positions by simply reminding the jury that anyone, on occasion, can resent a person she loves.

This argument would have some force if A.A.—after testifying that she feared Cosio—denied on cross-examination that she had a close relationship with Cosio, and that denial was then rebutted with the substantial co-worker testimony to the contrary. But if, on cross-examination, A.A. were to have admitted feeling close to Cosio (certainly a real possibility), that testimony—while casting doubt on her fear of him—would also have tended to undermine Cosio's fundamental defense that A.A. had resented him so much that she lied about the charges of sexual abuse, putting his life in serious jeopardy under the criminal law as a way of getting him out of her life (or at least away from interfering with her relationship with her tutors). While it may be true that one can resent, on occasion, a person she basically loves, it seems more solidly true that one who feels close, indeed loving, toward another person will not carry her occasional resentment to the point of putting the loved, though resented, person's life in serious jeopardy. Resentment surely has to be pervasive to do that, and that kind of resentment is hard to prove to a jury when one also is trying to rebut the government's "fear" argument with protestations of sustained closeness to the person resented. We are not convinced that a defense counsel—who of necessity had to demonstrate fabrication—can be held deficient for failing to present, and try to reconcile, both tactics.

Our doubts are reinforced by that fact that A.A. and Dr. Lindsay offered plausible reasons, other than fear, as to why A.A. did not report the sexual abuse earlier—reasons the government could stress to the jury even if its "fear" argument were contested. Thus, Cosio's argument that his coworkers' testimony would entirely undermine A.A.'s credibility by erasing her alleged fear of him rests on a premise too narrow to support reversal; that testimony would not have touched all the reasons offered for A.A.'s silence.

Appellate counsel reinforces his position, however, with trial counsel's own testimony at the § 23–110 hearing. There, trial counsel answered "yes" when the prosecutor asked: would proof of a cordial relationship between Cosio and A.A. "have gone some distance in rebutting the picture of physical abuse and fear that [A.A.] had portrayed"? Would such proof have been helpful for use at closing argument "on the issue of whether or not there was a fear factor between [A.A.] and Mr. Cosio"? And would such proof "not only [have] throw[n] into question the whole issue of her delay in disclosure, but also throw[n] into question her credibility" in testifying that "she was afraid of him because of the beatings"?

It is not clear how trial counsel's responses should be taken. Some defense counsel, we assume, will do everything possible to avoid the taint of "ineffective assistance" and therefore—admitting nothing—would fight any notion that an alleged deficiency, if corrected, would have helped the defense. Other defense counsel, we also assume, will become introspective, second-guess a losing strategy, and even fall on their proverbial swords to

help, in their view, a deserving client. It is impossible to tell from trial counsel's responses whether he is actually admitting constitutional deficiency or, we think more likely, is either acknowledging, upon reflection, that he could have done a better job or, even more likely, simply answering the questions asked without having an opportunity to place them in the larger context we have discussed above. In fairness to trial counsel, moreover, it is important to add, before finally evaluating his responses at the § 23–110 hearing, that in his affidavit submitted in response to the § 23–110 motion he noted that he "had performed a substantial amount of pretrial investigation"; that he and his investigator had interviewed Cosio's mother, sisters, A.A.'s friends, and school teachers, and "asked them what they knew about the relationship between defendant and A.A."; and that he had believed prior to trial that he "had investigated the relationship between Mr. Cosio and [A.A.] as fully as possible given the general constraints of time and resources."

▮ All things considered—indeed, in the absence of any questioning at the § 23–110 hearing that would have allowed trial counsel to discuss how (if at all) he would have used the coworker evidence in conjunction with a fabrication defense—we believe that his responses can have no major, let alone conclusive, significance as to his alleged deficiency. And in any event, they can have no bearing on the prejudice analysis, which his testimony never addressed. Case law applying *Strickland* not only warns against using "hindsight to second-guess [counsel's] strategy choices," *Mayo*, 13 F.3d at 533, but also teaches that when counsel reasonably pursues one line of defense, the pursuit of another line is not required. *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir.1998). That would be all the

more true when a second line of defense would create tension with the first. In the end, the relevant inquiry is not what defense counsel could have done but, rather, whether the choices that defense counsel made were reasonable. *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir.1998). We are satisfied that defense counsel's investigation, and the choices he made as a result, were constitutionally sufficient and, in any event, did not rise to the level of prejudice required by the Constitution for reversal of Cosio's convictions.

### III.

Cosio also argues that the trial court abused its discretion when it excluded a defense-proffered 1993 medical record of A.A.'s physical examination at Children's Hospital when she was ten years old. Trial counsel sought admission of that record, as interpreted by the defense expert, Dr. John Adams, to impeach A.A.'s credibility. What was counsel's theory? If Cosio had committed an act of carnal knowledge (rape) of A.A. between 1990 and 1991, the record of the 1993 examination would have shown injury to her hymen—but in fact did not. Thus, according to counsel, the 1993 medical record tended to show that A.A.'s claim of carnal knowledge in those early years was a lie.

The 1993 medical record did reflect that a doctor had examined A.A.'s genitalia and found that all was "normal." But there was nothing in the medical record itself to verify that A.A.'s hymen had been visually inspected, as it had been during the examination conducted by the government's expert, Dr. Lindsay, years later in 1997. Furthermore, the examining physician who created the medical record was not available to testify. Thus, in addition to moving the 1993 medical record in evidence, the defense sought to introduce expert testimony by Dr. Adams to prove there had

been no carnal knowledge by confirming that the examining physician would have inspected A.A.'s hymen before recording the genitalia as "normal."

### A.

In *Dyas v. United States*, 376 A.2d 827 (D.C.), *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977), we set forth a three-part test for the admission of expert testimony: (1) "the subject matter 'must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman'; (2) 'the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth'; and (3) expert testimony is inadmissible if 'the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert.'" *Dyas*, 376 A.2d at 832 (emphasis omitted) (quoting McCORMICK ON EVIDENCE § 13, at 29–31 (E. Cleary, 2d ed.1972)).

In addition to satisfying the *Dyas* criteria, the "expert witness opinion must be based on fact or adequate data. It is properly received so long as it is not a mere guess or conjecture." *Sponaugle v. Pre–Term, Inc.*, 411 A.2d 366, 367 (D.C. 1980). "Expert opinion evidence generally should be admitted whenever it will not mislead the jury and will prove useful in understanding the facts in issue." *Clifford v. United States*, 532 A.2d 628, 632 (D.C. 1987). A physician, in particular, does not lack competence merely because he or she is not a specialist in the particular field at issue; training and specialization go to the weight of the evidence, not to its admissibility. *Baerman v. Reisinger*, 124 U.S.App. D.C. 180, 181, 363 F.2d 309, 310 (1966). Medical experts thus may rely on tests and reports prepared by others. *Clifford*, 532 A.2d at 632.

The proffered expert testimony about the medical record in this case, of course, must be relevant; that is, it must tend "'to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence.'" *Winfield v. United States*, 676 A.2d 1, 2 (D.C.1996) (en banc) (quoting *Punch v. United States*, 377 A.2d 1353, 1358 (D.C. 1977), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978)). Once the trial court determines that the evidence is relevant, it must then weigh the probative value of that evidence against the risk of unfair prejudice and the likelihood that the evidence would mislead or confuse the jury. *Id.* at 5.

If, after applying all the foregoing criteria, the trial court excludes the proffered expert testimony and related evidence, this court on appeal will review that decision for abuse of discretion, and the trial court's decision will not be reversed unless "manifestly erroneous." *Coates v. United States*, 558 A.2d 1148, 1152 (D.C. 1989). This means that even if the trial court exercises its discretion in error, we must review the impact of that error in order to determine whether it is of a sufficient magnitude to require reversal. *Johnson v. United States*, 398 A.2d 354, 366 (D.C.1979).

### B.

Before ruling on the proffered evidence, the trial court received conflicting testimony about whether a Children's Hospital doctor would have examined the hymen of a ten-year-old girl during a standard "school physical." Dr. Adams testified that he "assume[d]," based upon his "knowledge of the standard practice and that [1993] record," that the examining

doctor had visually inspected A.A.'s hymen, but he acknowledged it was possible that the finding of "normal" contained in the record resulted from an examination of only the external area of the genitalia.

Dissatisfied with Dr. Adams's testimony, the trial court commented:

[M]y problem is as a woman, as a mother of two daughters, and watching the faces of the women in this courtroom who are observing, the notion of your expert who doesn't do these routine examinations that in a routine examination of a young girl the labia is pulled aside and the hymen is observed ... just flies in the face of every experienced—[ ]... I won't make a ruling based on that knowledge of mine but I certainly think that anything that flies in the face of common sense, directly needs to be explored further."

The court asked the prosecution to call as a rebuttal witness Dr. Muriel Wolf, a pediatrician at the Children's Hospital. Dr. Wolf testified that her personal practice was to visually inspect the hymen. She further testified, however—over vigorous defense objection—that based on her informal survey of eleven other physicians there was no uniform practice as to whether pediatricians at Children's Hospital would visually examine the hymen during routine physical examinations.

The trial court then excluded the medical record on three interrelated grounds. First, the court noted that the record's "arguable relevance" was "outweighed by prejudice here," namely "the confusion and the suggestion that the premise on which relevancy depends has been established and it has not," that is, "that the hymen was observed in 1993." Second, the court found in the alternative that Cosio's expert was not "qualified to examine routine child records" and to opine on whether the hymen would have been visually examined

during A.A.'s 1993 physical. Third, the court added that "whether or not the hymen was observed in 1993" was "not really a subject of opinion testimony anyway. It's fact." Thus, "the factual predicate" for relevance was "not established."

The latter two grounds for exclusion are problematic. As to Dr. Adams's qualifications, the trial court record establishes that he was an experienced pathologist who regularly interpreted medical records in his work, including records resulting from the examination of children. The court accordingly had found Dr. Adams qualified to talk about medical records generally. Thus, the later finding that he was not qualified to testify about "routine" children's medical records is perplexing— especially because a medical witness's "training and specialization," as well as the "degree of certainty" expressed, goes to the weight, not admissibility, of evidence. *Baerman*, 124 U.S.App. D.C. at 181, 363 F.2d at 310; *Coates*, 558 A.2d at 1152.

We also are doubtful about the trial court's finding characterizing as "fact," not as "opinion testimony," the question whether A.A.'s "normal" examination of her genitalia in 1993 would have included an inspection of the hymen. There might well have been a standard practice that an expert could have verified. We think, however, that in offering this third ground for exclusion the trial court, in effect, was repeating the concern that she expressed in her first ground: that however relevant the 1993 record might have seemed in the abstract, there was too much uncertainty expressed by both Dr. Adams and Dr. Wolf about the likelihood that the hymen had in fact been examined—an uncertainty that would have led to prejudicial confusion and thus jury speculation. We turn, therefore, to this remaining ground for exclusion.

Dr. Adams was prepared to testify that observation of the hymen was a standard practice, and that the 1993 medical record showed no indication of any injury. Furthermore, the court's own expert witness, Dr. Wolf, acknowledged that she personally would have examined the hymen. She also testified, however, that this practice was not universal; the decision by others to do so would depend on the practice of the individual doctor. Cross-examination of Dr. Adams, moreover, would have revealed that he had no personal knowledge of whether the examining physician had observed the hymen and that, as Dr. Wolf had testified, there was an unmeasurable possibility that A.A.'s hymen had not been examined.

■ In reviewing this evidentiary issue on appeal, we must give Dr. Adams's proposed testimony "its maximum reasonable probative force and its minimum reasonable prejudicial value." *Ibn–Tamas v. United States,* 407 A.2d 626, 639 n. 27 (D.C.1979) (quoting WEINSTEIN'S EVIDENCE ¶ 403[03] (1978)). There is some force to the argument that Dr. Adams's bottom-line opinion—that the examining physician would have inspected A.A.'s hymen—was for the jury to consider under proper instructions; it was not for the judge to reject simply because Dr. Adams had acknowledged the possibility of no such inspection, and because another expert cast further doubt on the Adams opinion. The jury's role, after all, is to weigh conflicting testimony and decide which to credit. Furthermore, although defense

counsel did not object to the court's calling its own expert witness (Dr. Wolf), counsel did object strenuously to the court's admission of Dr. Wolf's particular testimony that relied on hearsay—contrary to her own personal medical practice—derived from an informal poll of unidentified doctors whose credentials were not established.[3] That objection seems persuasive, given the lack of any discernible basis for saying that Dr. Wolf folded her informal survey into an expert opinion. It was never clear what Dr. Wolf's own bottom line opinion was: the same as Dr. Adams's, based on Dr. Wolf's own experience? Or a contrary opinion, based on her informal survey, that a Children's Hospital physician would not have examined the hymen? If the Adams and Wolf testimony were the entire universe of evidence on which our ruling should be based, therefore, we would conclude that the trial court erred in allowing Dr. Wolf's testimony to scuttle Dr. Adams's testimony and the accompanying medical record, and that this error, all things considered, would have been of a magnitude requiring reversal—and thus an abuse of discretion. *Johnson,* 398 A.2d at 367.

But the Adams and Wolf testimonies were not the only expert evidence that had relevance to the 1993 medical record. Even if the trial court erred in limiting Dr. Adams's testimony and excluding that record, we believe that Cosio proceeds here from a flawed premise and suffered no

---

**3.** Without question, the trial court's decision to exclude the 1993 medical record and Dr. Adams's related expert testimony was based in part on the results of the court's intervention into the proceedings by calling Dr. Wolf as the court's own witness. Although "a judge is not an investigator," *Davis v. United States,* 567 A.2d 36, 42 (D.C.1989), a trial judge does have "the right to call witnesses on [her] own initiative when [she] has reason

to feel the witness may contribute to a determination of the truth as to the matter in controversy." *Fortune v. Fortune,* 138 A.2d 390, 391 (D.C.1958). Cosio has not challenged the conduct of the trial judge in calling a court witness as such (in contrast with challenging the admissibility of a portion of that witness's testimony), and thus we need not inquire further into the propriety of the court's decision to call Dr. Wolf as a witness.

significant prejudice from these trial court rulings.

We shall accept for purposes of discussion, as Cosio would have it, that the doctor had visually inspected A.A.'s hymen during her 1993 physical exam when he determined that the genitalia were "normal." If A.A. had been raped in 1990 or 1991, the assailant—to quote A.A.—would have "put his penis in [her] vagina." Otherwise, her hymen would probably not have been injured. But relying on both her "own experience and studies that she ha[d] read," the government's expert, Dr. Lindsay, testified—and defense counsel called on neither Dr. Adams nor anyone else to rebut her observation—that when "adult men rape young girls" (*i.e.*, in statutory language have "carnal knowledge"), the penis typically "lie[s] in between the lips," that is, "the labia majora," while not "penetrating into the vagina," in which case there would be "no" injury to the hymen. In other words, as the statute defines carnal knowledge, the assault could have occurred through such partial penetration, permitting the hymen itself to remain "normal." [4]

Furthermore, Dr. Lindsay noted that even when there is enough penetration to injure the hymen, that kind of injury can "heal quickly" and "may or may not leave a sign or a scar." Cosio offered no testimony from Dr. Adams (or anyone else) to rebut that expert assessment. Finally, although A.A. herself testified that Cosio had put his penis in her vagina when she was seven, Dr. Lindsay noted, without contradiction, that many times children believe the penis has entered the "vagina"

when in fact it has penetrated only the labial lips.

Accordingly, a physical examination of A.A. in 1993 finding her hymen "normal," would have been only marginally, if at all, probative of whether there had been a rape (carnal knowledge) of this young girl in 1990 or 1991. Dr. Lindsay's uncontradicted testimony demonstrated that even if A.A.'s examining physician had observed her hymen in 1993 and found it "normal," it would require pure speculation to conclude that no rape had occurred.

In sum, the testimony of Dr. Adams, Dr. Lindsay, and Dr. Wolf, individually and collectively, left room for substantial doubt that A.A.'s hymen had been inspected. But even if it had, there was uncontradicted expert testimony that, because of A.A.'s young age, her assailant would probably not have penetrated her vagina and injured her hymen. Furthermore, uncontradicted expert testimony showed that even if penetration had occurred, the hymen might well have healed during the two or more years between the assault and the "normal" physical exam. Finally, external inspection of the genitalia by the examining physician in 1993 would have had no probative value for a criminal offense premised on sexual penetration. Therefore, we cannot say that the trial court's refusal to allow the jury to inspect the 1993 record, or to hear what Dr. Adams would say about it, brought any meaningful prejudice to Cosio's defense; the probative value in his favor would have been virtually nil once the government had demonstrated from uncontradicted testimony, based on expert studies, that the presence of a "normal" hymen in 1993 was a virtual

---

4. The "carnal knowledge" (rape) statute that would have been applicable to an assault in 1990 or 1991, D.C.Code § 22–2801 (1981), requires as "an essential element of the crime" the "penetration of the victim's sexual organs." *Williams v. United States,* 357 A.2d 865, 867 (D.C.1976). But "the government need not prove full penetration since the offense is committed if the male organ enters only the labia of the female organs." *Id.*

irrelevancy. Any use of that record in Cosio's favor would have been speculative at best. Based on all the evidence, there was no abuse of trial court discretion in withholding the medical record and Dr. Adams's comments about it from the jury.[5]

## RESPONSE TO DISSENT

The dissent's approach to the ineffectiveness-of-counsel claim requires further comment. The Supreme Court has recognized, in *Strickland*, that for every defense of a criminal case there is a "wide range of reasonable professional assistance" and, accordingly, that there must be a "strong presumption" that counsel has given constitutionally adequate assistance. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. With that teaching in mind, we have stressed that, if counsel had learned of the coworker evidence but elected not to use it, that tactical decision would not have been constitutionally deficient; *Strickland* would have granted leeway for counsel's professional judgment as to whether that coworker evidence would have undermined or aided Cosio's fabrication defense. On the facts of this case, not even an imputed awareness of the coworker evidence would have required trial counsel—and thus does not require this court—to substitute a different trial strategy for the one counsel himself employed in ignorance of that evidence.

The case from this jurisdiction that comes closest to informing the analysis is *Chatmon v. United States*, 801 A.2d 92, 108 (2002). In that case, in which the defendant was convicted of first-degree felony murder and armed robbery, defense counsel, through cross-examination of a government witness, opened the door to admission of damning identification testimony that the government had agreed not to proffer because of defective identification procedures. At the hearing on collateral attack alleging ineffective assistance of counsel, trial counsel offered a highly questionable rationale for why he had invited the identification testimony—a rationale that the trial judge said made "no sense." The government, however, offered several arguments explaining why counsel's tactic actually did make sense. This court thus confronted the question whether *Strickland* permitted a reviewing court to ignore a deficient rationale for defense counsel's performance by invoking a sound, alternative rationale that counsel had not considered and, as a result, to save the conviction. Judge Ruiz said no: "Analysis under *Strickland* is highly fact bound . . . . Therefore, once the record establishes the actual tactical explanation for counsel's actions" (which was nonsensi-

---

5. Citing *Scull v. United States*, 564 A.2d 1161, 1166 (D.C.1989), Cosio asks us to apply not "abuse of discretion" but "constitutional harmless error" as the standard of review, meaning that reversal would be required unless the trial court's error in excluding the evidence was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Scull* applied the Sixth Amendment confrontation clause to exclusion of evidence during cross-examination of a witness for bias—an issue of constitutional dimension under the elaboration of *Chapman* which this court spelled out in *Clark v. United States*, 639 A.2d 76 (D.C.1993). There, we said that constitu-

tional harmless error analysis applies where "the trial court's evidentiary ruling wholly deprived the defendant of any opportunity to cross-examine a witness or present evidence concerning bias or a central issue in the case. . . ." *Id.* at 81. In this case, however, the exclusion of the medical record and Dr. Adams's related testimony had a bearing not on bias but on A.A.'s general credibility. Although her credibility was a "central issue," *id.*, defense counsel was not precluded from cross-examining A.A. and questioning her credibility in other ways. Accordingly, we are not presented with an evidentiary issue of constitutional dimension.

cal in *Chatmon* ), "the government is not free to invent a better-reasoned explanation of its own." *Id.* at 108–109.

*Chatmon,* however, also recognized that, under *Strickland,* a defendant on collateral attack must " 'show that counsel's representation fell below an objective standard of reasonableness.' " *Chatmon,* 801 A.2d at 108 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052). And, as we have noted earlier, *Strickland* forbids a finding of constitutional deficiency if counsel has made a "reasonable decision" to offer a defense that made "unnecessary" the particular investigation[ ]" that defendant has cited on collateral attack as an omission of constitutional dimension. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. We believe these principles support the following proposition: If it is true (as we explained earlier and elaborate further below) that Cosio's trial counsel would not have been constitutionally deficient had he known about the coworker evidence and consciously decided to withhold it, we do not run afoul of *Strickland,* as interpreted in *Chatmon,* by saying—on the facts here— that trial counsel was not deficient in failing to discover and introduce that evidence. By relying on this hypothetical proposition to make the point, we are not widening the universe of information "to invent a better-reasoned explanation" than the record permits; we are merely explaining the "objective reasonableness" of the defense presented. Unlike the blatant sin of commission in *Chatmon,* which this court would not permit the government to rationalize away, we consider here an al-

leged sin of omission, which the enhanced record on collateral attack does not permit us to characterize as a prejudicial trial deficiency under *Strickland.*

In the first place, the "actual tactical explanation" for trial counsel's actions in this case—unlike the explanation in *Chatmon* that made "no sense"—is simple, straightforward, and plausible. Counsel sought to establish a fabrication defense through (1) cross-examination of A.A. that would reveal her deep resentment of Cosio, coupled with (2) introduction of a medical record—interpreted by expert testimony—contradicting A.A.'s assertion that she had been raped in 1990. In short, counsel sought to establish that A.A. was a liar. No one, and certainly not our dissenting colleague, has suggested that this defense was inherently deficient.[6] To the contrary, the dissent argues only that counsel could have provided a *better* defense by adding coworker testimony to rebut A.A.'s claimed fear of Cosio.

The question, then, is not—as in *Chatmon*—whether a reviewing court can accept a government-proposed cure of an inherently deficient rationale for counsel's performance by identifying a sound rationale that counsel failed to discover. The question, rather, is whether a reviewing court can reject an inherently sufficient rationale for counsel's performance by faulting counsel's failure to discover evidence that allegedly would have made the defense stronger.

The answer might be yes if counsel had made no effort to discover the kind of evidence at issue. But that was not the

---

**6.** As indicated in Part III above, the trial court—we conclude erroneously—refused to admit the medical record and related expert testimony in evidence, although we have further concluded that this error was not of a magnitude requiring reversal and thus (in the language of our standard of review) was not an abuse of discretion. Accordingly, the fail-

ure of the defense to proceed on all cylinders with its intended defense was not enough in itself to warrant reversal—a conclusion with which the dissent does not disagree. Nor does appellant or the dissent attempt to link this failure of the proffered defense to the claim of ineffective assistance of trial counsel now under discussion.

situation here; trial counsel explored A.A.'s relationship with Cosio through questioning those in the best position to know: their family members. This is not a case like *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), relied on by the dissent, premising reversal for ineffective assistance of counsel on "a total failure to conduct pretrial discovery," indeed a "complete lack of pretrial preparation." *Id.* at 385, 386, 106 S.Ct. 2574.

We would agree that counsel also might be held deficient if counsel's failure to discover particular evidence (such as the coworker testimony), if negligent, deprived the defendant of testimony powerful enough to create a reasonable probability that the outcome of the trial would have been different—an analysis effectively merging the deficiency and prejudice prongs of *Strickland*. But, as we have already explained, that is not the case here, either. The co-worker evidence might or might not have helped the Cosio; its admission might well have tended to undermine the fabrication defense, creating a tough judgment call for defense counsel if he had been apprised of the evidence. Accordingly, we do not believe that a reviewing court can declare counsel constitutionally deficient simply because the appellate judges, looking back over the trial record, conclude that they could have found a way—had they been trial counsel—to finesse the tension between the coworker testimony (demonstrating closeness between A.A. and Cosio) and the fabrication defense (demonstrating how much A.A. resented Cosio).

The dissent, however, offers still another, final answer to our analysis. In effect, the dissent calls the tension we perceive between the coworker testimony and the

fabrication defense a red herring and, as a result, claims that trial counsel's defense falls below *Strickland's* standard of "objective reasonableness." Why? Because the closeness the co-workers saw between A.A. and Cosio appears to have predated A.A.'s relationship with her tutors, and thus—it is claimed—predated the resentment on which her fabrication was built. In short, the dissent suggests, defense counsel could (and thus should) have rebutted A.A.'s alleged fear of Cosio with the co-worker testimony, followed by an argument that she had lied about the sexual abuse because she had come to resent Cosio's attempted interference with her mentor relationship.

We do not believe that the defense necessarily would sort out into such neat, sequential and thus separable packages. To rebut A.A.'s alleged fear of Cosio over a long period of time, counsel would have had to use the co-worker testimony to demonstrate that A.A. was very, very close to Cosio for a long period of years extending through October 1997, when the last abusive sexual act allegedly took place. Counsel could not have stopped with showing merely moderate closeness; otherwise, A.A.'s fear might not have been erased in the jury's mind. If counsel were to establish such a tight bond between them, however, we cannot be confident that a jury would then find it credible that a young woman, portrayed in that intimate, loving way, would have turned on her half-brother very suddenly—to the point of charging him with a multitude of very serious, abusive crimes—within days of meeting her new tutors in the fall of 1997. It is just as likely, if not more so, that the jury would have found such a defense presentation confusing, counterintuitive, and thus unpersuasive.[7]

---

7. Nor could counsel have argued convincing-   ly to the jury that if A.A. was really afraid of

Furthermore, the coworker evidence, if offered to rebut A.A.'s claimed fear of Cosio, would have had no bearing on the fear A.A. expressed for the first period in which she claimed Cosio had raped her (in 1990), since none of the co-workers observed her with Cosio at IDP until she had returned to D.C. from boarding school several years later. Finally, as elaborated earlier, fear was not the only reason the government proffered (with the help of expert testimony) for A.A.'s failure to tell anyone about her sexual abuse. Accordingly, the coworker testimony, even if presented at trial, would not have been a complete answer to the so-called "fear factor." In sum, we cannot say that, if trial counsel had been aware of the coworker testimony, the only objectively reasonable trial strategy would have required counsel to introduce that evidence in the defense case.

To repeat: in pointing out the various reasons—all based in the record—why competent counsel might not have chosen to offer the coworker testimony at trial, even if aware of it, we are not providing rationales that cannot be imputed to trial counsel under the teaching of *Chatmon*. In that case, trial counsel had no acceptable—no objectively reasonable—rationale for his performance, and we would not permit the government to think one up for him. Here, in contrast, trial counsel had a plausible theory of the defense. And the record reflects sound reasons why the alternative (or supplementary) theory, proffered on collateral attack, would not necessarily have been so much more effective than the defense presented that we can say counsel's performance fell below the "objective standard of reasonableness" required by the Constitution. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

Because Cosio has not demonstrated constitutionally ineffective assistance of trial counsel or the abuse of trial court discretion in excluding evidence and testimony concerning A.A.'s 1993 medical examination, we must affirm all convictions.

*So ordered.*

SCHWELB, Associate Judge, dissenting.

In my opinion, Cosio received ineffective assistance from his trial counsel and, as a result, lost an opportunity to undermine and possibly to shatter the credibility of the principal witness against him. I conclude that he is entitled to a new trial. Accordingly, I respectfully dissent.

## I.

### INTRODUCTION

Six years ago, on July 17, 1998, Cosio was convicted by a jury of taking indecent liberties with his younger half-sister, A.A., carnal knowledge of A.A., and three counts each of first degree and second degree child sexual abuse of A.A. On December 7, 1998, Cosio was sentenced to serve a cumulative prison term of thirty-three years to life.[1] On March 22, 2002, through his

---

Cosio, she would have been less likely to bring charges against him than if she was not afraid of him, and thus that the coworker testimony would have complemented, not contradicted, the fabrication defense. That argument presupposes a profound resentment simultaneously present in a loving half-sister—a psyche not necessarily easy to grasp. Moreover, the argument misses the point, for once A.A. felt she was in the safe harbor of

her tutors, it is not particularly difficult to understand why her intense fear of Cosio, while not erased, might have been neutralized by courage, coupled with encouragement, to the point of A.A.'s willingness to press charges.

1. During his trial, Cosio expressed dissatisfaction with his trial counsel, and David Sitomer, Esquire, who had represented Cosio in a

present counsel, Cosio filed a motion pursuant to D.C.Code § 23–110 (2001), to vacate his sentence, claiming that his trial counsel was constitutionally ineffective. On November 21, 2002, following an evidentiary hearing, the trial judge denied the motion in a written order. Cosio has filed consolidated appeals from his conviction and from the order denying his § 23–110 motion.

The transcript in this case reveals that at the trial, A.A. obviously came across as a believable and sympathetic witness, and the defense had little success in challenging her credibility. This was so in spite of two aspects of the case that made it most unusual. First, the initial alleged sexual abuse of A.A. (Round I) occurred, according to her, when she was seven years old, at which time she and five other family members were all living in the same room. The subsequent abuse, when A.A. was eleven to fourteen (Round II), allegedly occurred with A.A.'s mother and siblings in adjoining rooms. Nevertheless, no family member ever gave any indication that he or she was aware that A.A. was being abused, and no witness corroborated A.A.'s account at trial.

Second, and most importantly for purposes of this appeal, for a period of *seven years,* A.A. did not reveal the alleged abuse to anyone—not to her mother; not to her older sister, E.A., to whom she was very close and who disliked Cosio; not to the principal or to any staff member at her boarding school; and not to anyone at her school in the District. She finally related her allegations in late 1997 to Michael Ledesma, a young attorney whom she had known only for a few weeks, who was tutoring her, on whom she apparently had a crush, and who was evidently on hostile terms with Cosio.[2]

A.A. testified that throughout the seven-year period, her failure to report the abuse was attributable to her fear of Cosio who, according to A.A., had beaten and mistreated her. At the trial, Cosio's counsel—by his own admission at the subsequent § 23–110 motions hearing—failed to focus on the question whether anyone had seen Cosio and A.A. together and could testify regarding the nature of their relationship, or regarding whether A.A. was in fact, or appeared to be, afraid of Cosio as the prosecution alleged. At the hearing on the § 23–110 motion, on the other hand, Cosio's present attorney produced four witnesses who had observed A.A. interact with Cosio. These witnesses testified that A.A. liked to visit her half-brother and to be with him, that she spent time with him when there was no need to do so, and that she consistently acted affectionately towards him; in other words, she evidently liked him. The cordial relationship between the two of them could not readily be reconciled with A.A.'s proclaimed fear of Cosio or with her description of him, at trial, as an enemy and persecutor whom she claimed to have forgiven in conformity with a biblical directive.

Because, as trial counsel effectively acknowledged, he conducted an incomplete and inadequate investigation and failed to grasp the critical nature of the "fear" issue, the relevant testimony of these wit-

non-criminal matter, informed the court by letter of Cosio's dissatisfaction. It does not appear that the judge took any action at all as a result of this letter. Mr. Sitomer represented Cosio at sentencing, and he was initially appointed to represent Cosio on appeal. On November 1, 2000, more than two years after sentencing, Mr. Sitomer's appointment was vacated and his present counsel entered his appearance in Cosio's behalf.

**2.** Following his arrest, Cosio was ordered by the court to stay away from A.A. and from Ledesma.

nesses was not adduced at the trial. Further, the information was not used by the defense to cross-examine A.A. Trial counsel's failure to detect his opportunity to exploit the Achilles heel of the prosecution's case—A.A.'s silence over a seven-year period, supposedly generated by fear of Cosio—gave the prosecution a free ride with respect to A.A.'s credibility, and this resulted in a dramatically different trial from the one that would have taken place if counsel had detected, and had gone for, the jugular. For these reasons, on which I elaborate below, I conclude that Cosio's trial attorney was constitutionally ineffective. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

I also conclude, in part but not exclusively for reasons set forth in the majority opinion, that the trial judge abused her discretion by excluding from evidence a medical record of a physical examination of A.A. which was performed on October 5, 1993, some three years after the first alleged penetration of her vagina by Cosio. See Part V, *infra.* This examination reflected that the condition of A.A.'s genitalia was "normal." In my opinion, the record of this examination should have been admitted into evidence. Because I would order a new trial for other reasons, I need not and do not reach the question whether what I regard as an erroneous evidentiary ruling was prejudicial or, as the majority asserts, harmless.

## II.

### THE TRIAL

Because my sense of this case and my emphasis differ markedly from Judge Ferren's, I think it best to state the facts in

my own way. As is so often true, the devil is in the details, some of which I view as far more important than the majority does.

### A. *The case for the prosecution.*

A.A. testified at the trial that when she was seven years old, she and her family—her mother, her sister and two brothers, her half-brother Richard (Cosio) and A.A.—lived together in a crowded efficiency apartment in northwest Washington, D.C. All six of the family members slept together in the living room. A.A. related that before she met her half-brother, who was then eighteen or nineteen years of age, and who had come to Washington, D.C., from Peru, she "thought he was like an angel having a robe and flying in the air." When Richard [3] joined the family, however, he did not live up to his angelic image. Instead, Richard treated A.A. and her siblings "bad," and he "would hit us and stuff." But "hit[ting] and stuff" was not all. A.A. testified that one night, with the lights off in the apartment, and with the whole family apparently in the room, perhaps asleep, Richard moved towards A.A. from behind, touched her on the breasts, and finally put his erect penis in A.A.'s vagina. According to A.A., Richard had his hand over her mouth and prevented her from saying anything. A.A. believed that Richard subsequently engaged in similar abuse more than once during the family's residence in the efficiency apartment, all of this having occurred when she was about seven.

A.A. testified that she did not report the first incident, or any later abuse, to her mother because, simply stated, she was afraid of Richard:

Q. Did you tell anyone?

---

**3.** Because A.A. referred to Cosio as "Richard," we likewise use that name in relating her testimony.

A. No, sir.

Q. You didn't tell your mother?

A. No, sir.

Q. Why not?

A. Because I was afraid.

Q. What were you afraid of?

A. I was afraid of him. I was afraid that she wouldn't believe me.

Q. When you say you were afraid of him, what exactly were you afraid of?

A. If I went to my mom, that I don't think she will believe me, and then after she will say something to him and then after he will like hit me or something like that.[4]

Following the school year during which this first round of alleged abuse took place, A.A. and three of her siblings were sent to the Mount Ann Mission School in Virginia. There, according to A.A.'s testimony, she tried not to think about the abuse at all. Although she was now approximately an eight-hour drive away from Richard and not in any immediate danger from him, A.A. did not reveal her harrowing experience to anybody:

Q. Did you tell anyone what he had done?

A. No, sir.

Q. Why not?

A. Because I was too afraid.[5]

When A.A. was about ten years old, she and two siblings left Mount Ann Mission School and returned to Washington, D.C. The family eventually moved to a two-bedroom apartment. According to A.A., Richard again began to abuse her sexually at this apartment when she was eleven years old. He again touched her breasts, again placed his penis in her vagina, thrust in and out, and apparently ejaculated. A.A. testified that following the resumption of this unwelcome sexual activity, the abuse continued for several years and occurred on a number of occasions each year while she was eleven, twelve, thirteen and fourteen years of age. On one occasion, Richard also engaged in anal intercourse with A.A. The last sexual encounter, according to A.A., occurred around Richard's birthday, on October 27, 1997.

Throughout this second and protracted period of alleged abuse, A.A. again failed to report Richard's actions to anyone:

Q. After that time when you were going into the fifth grade, did Richard hit you any more?

A. No, sir.

Q. Did you tell anybody that the sexual abuse had started again?

A. No, sir.

Q. Why not?

A. I was too afraid.

Q. Afraid of what?

A. Afraid of him.[6]

4. In his opening statement, the prosecutor anticipated this evidence:
[A.A.] didn't tell anybody. She was too scared to tell. She was too scared to say anything. She was too scared to make even a noise. She didn't know what her brother would do to her, so she just kept quiet about it and let it happen.

5. The alleged first round of abuse of A.A., which was said to have occurred when she was seven years old, was not charged in the indictment, but was introduced into evidence to show that Cosio had an unusual sexual preference, *Dyson v. United States*, 97 A.2d 135 (D.C.1953), and to put the charged conduct in context. The alleged beatings were introduced under the doctrine of *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964).

6. Immediately following this exchange, when asked what she was afraid that Richard might do, A.A. responded: "I don't know, go insane." In context, this was not an expression of sympathetic concern regarding Cosio's mental health, as the trial judge seemed to believe, but an obvious elaboration on why

Although she was very close to her older sister, E.A., and although E.A. disliked and resented Richard, A.A. did not tell her about the abuse because "I mean I was scared." E.A. did not return to Washington from Mount Ann Mission until 1996, so A.A. was still too afraid of Richard, two years after the "second round" of alleged abuse began, to confide in her older sister about it.

In the fall of 1997, A.A. met Roseanne Medina and Michael Ledesma, two young attorneys who were briefly married to one another,[7] and who began to tutor A.A. According to A.A., Richard objected to the tutoring, apparently because A.A. would come home too late and because he apparently suspected possible improprieties between Ledesma and A.A. Cosio believed that A.A. had a "crush" on the young lawyer and that she wanted to spend as much time as possible with Mr. Ledesma. Cosio wished to put an end to A.A.'s relationship with a man twice her age. Mr. Ledesma became A.A.'s guardian for a time, visited her on three occasions at Mount Ann Mission School (where she was once again a student), took her shopping, and gave her money to purchase Christmas presents for her family.

One day, after having known Mr. Ledesma for several weeks, A.A. tearfully related to him that Richard had been sexually abusing her. She explained that she finally made the revelation at this time because "like he was a lawyer and his wife was a lawyer and stuff, they could try to find me help or something." This was the first

time that A.A. had told anybody about the alleged abuse. Mr. Ledesma separated from his wife approximately two months after A.A. reported Cosio's alleged criminal conduct.

After making her allegations to Mr. Ledesma, A.A. was interviewed by the police and examined at Children's Hospital by Beverly Lindsay, M.D., a pediatrician who later became a witness for the prosecution. Dr. Lindsay testified that A.A. had two cleaves in her hymen, and that these cleaves were "highly suggestive of [A.A.'s having been] sexually abused." Dr. Lindsay acknowledged, however, that the condition of A.A.'s hymen could have been caused by any large foreign object, and not just by a penis:

Q. It was a foreign object that did so; correct?

A. I would not be able to say what it was. The only thing I say is something. I cannot say if it [was] foreign to her or what.

Q. So you can't say what it was, therefore,—

A. I cannot say what it is that entered into her vagina. The only thing I can say is something entered into her vagina that caused these cleaves.

Dr. Lindsay was not asked, and did not opine, whether the condition of A.A.'s hymen was consistent with regular and repeated sexual intercourse over a period of years.[8] The absence of evidence on this

A.A. claimed to be so afraid of him. As the prosecutor explained in his opening statement,

> once again [A.A.] did not tell anyone. She was still too scared of him, too scared of what might happen. She had no idea what he might do. He had a short temper, he had beat[en] her before, and she decided to just keep quiet about it.

7. In his brief, Cosio's attorney represents that according to Superior Court records, Mr. Ledesma and Ms. Medina were married on April 4, 1997, separated on January 12, 1998, and divorced on December 17, 1998.

8. Illustrating her point with a very recent incident in her practice, Dr. Lindsay also testified that children would often fail to report

subject was significant, for according to A.A., the abuse had been going on for a very long time.

## B. *The defense case.*

Jose Garcia and Nora Carnathan both worked with Cosio at International Data Products (IDP) in suburban Maryland, and each testified as a character witness on Cosio's behalf. Mr. Garcia and Ms. Carnathan described Cosio as a law-abiding person with a good reputation. Neither witness knew what Cosio may or may not have done in the privacy of his home. No questions were asked of either witness regarding the relationship between Cosio and A.A.

John Adams, M.D., who was qualified as an expert in forensic pathology and interpretation of medical records, testified that the findings based on A.A.'s December 1997 medical examination, which had been prepared by Dr. Lindsay, indicated that A.A. suffered penetrating injuries nonspecific to sexual abuse; in other words, the penetration could have been effected by a penis, but a penis was not necessarily involved. Dr. Adams explained that unless semen was present, there are "few medical findings or medical evidence that [are] specific for sexual abuse." According to Dr. Adams, the findings in 1997 that A.A. had an "abnormal hymen" or a "cleft in the hymen" were specific as to trauma, but did not establish sexual abuse. Dr. Adams stated that these clefts could have been caused "by any kind of foreign object, be it a penis, be it a finger, be it any firm or rigid foreign object ... there [was] nothing that [proved that] this injury was done by a penis."

Dr. Adams also testified that it is important to measure the hymenal opening (which was not done in A.A.'s case) because the opening is usually small in a child. If the opening had been measured, and if tears were visible, "then it [would be] more likely there ha[d] been vaginal penetration with a human penis." According to Dr. Adams, the injuries to her hymen had healed without causing a larger hymenal opening. This was consistent, in the witness' opinion, with a single instance, as opposed to repeated episodes, of hymenal trauma. The prosecution claimed, of course, that Cosio had intercourse with A.A. frequently over a period of several years.

The defense also sought to elicit Dr. Adams' testimony regarding the record of an examination of A.A. in October 1993, some three years after the initial period of abuse began. According to this record, the condition of A.A.'s hymen and genitalia was determined to be normal. The trial judge excluded this testimony. See Part V, *infra.*

## III.

## THE § 23–110 MOTION

### A. *The evidence.*

In his § 23–110 motion, Cosio alleged that his trial counsel had been constitutionally ineffective by failing to interview readily available witnesses regarding information which contradicted the government's theory, and A.A.'s testimony, that for seven years, A.A. failed to reveal the alleged abuse primarily because she was afraid of Cosio. Cosio's attorney presented four affidavits in support of the motion. The affiants—Rafael Villatoro, Erick Estrada, Henry Estrada and Jose Garcia—had worked with Cosio at IDP, where they had ample opportunity to observe the interaction between A.A. and Cosio. Each affirmed that A.A. was, in essence, affectionate, friendly, at ease and eager to be

sexual abuse because they were afraid of their abusers.

with her older half-brother, in striking contrast to the government's depiction of A.A. as fearful and apprehensive of him.[9] After the government had responded to Cosio's motion, the trial judge issued an order setting a hearing. The judge wrote that trial counsel had failed to explain "why he chose not to corroborate the fabrication defense with evidence that, prior to [A.A.'s] relationship with Michael Ledesma, she appeared not to have any fear of [Cosio]."

At the hearing, which was held on September 12, 2002, the court heard testimony from Rafael Villatoro, Erick Estrada, Henry Estrada, Roxanna Fuster and Cosio's trial counsel. All four coworker witnesses described a relationship between A.A. and Cosio that was anything but tense or fearful. Specifically, Henry Estrada testified that A.A. was "playful" with Cosio when she visited him at work; that they would share a laugh; that she would greet him with a "kiss on the cheek" and a hug; and that they were "very comfortable" together.

Roxanna Fuster, Cosio's supervisor, testified that she gave A.A. permission to come to the IDP offices—indeed, A.A. herself requested the permission—"[a]nd then she herself approached me and asked me is it okay that she can be at the lab or at one of the offices, if it was okay for her to stay, and I said yes." Ms. Fuster understood that A.A. was "bored at home" and wanted to come to the offices to "hang around Richard." According to Ms. Fuster, A.A. would take a bus from the District out to IDP's offices in Gaithersburg, Maryland; she frequently did so after school. During the summer months, A.A. would sometimes stay at the office with her brother all day. In other words, this was not a scenario in which A.A. was being forced to be with Richard. On the contrary, A.A. actively sought to be with a man whom, according to her testimony and the government's theory of the case, she had feared for years because he had sexually abused her. Ms. Fuster testified that "[t]o me she was there out of her own will; I mean, she came on the bus, she was there—she wanted to be there; she told me she wanted to be there...." [10]

As a supervisor, Ms. Fuster had "plenty of opportunity" to observe the interaction between A.A. and Cosio. Ms. Fuster would also often talk, one-on-one, with A.A. She described A.A. as a "very happy girl" who had a "friendly, normal, healthy relationship" with Cosio. Ms. Fuster never sensed that A.A. was afraid of Cosio, or uncomfortable around him in any way.

Ms. Fuster also observed that A.A. and Cosio enjoyed the same cordial relationship when they were together outside the office, e.g., at company picnics and at holiday parties. On one occasion, Cosio and A.A. came to Ms. Fuster's home to assist with some maintenance projects. Ms. Fuster had not requested that A.A. accompany Cosio, but A.A. came. This visit occurred during the summer of 1997, a few months before A.A. met Mr. Ledesma.

Rafael Villatoro and Erick Estrada provided accounts of the relationship between A.A. and Cosio which paralleled the descriptions given by Henry Estrada and

9. One of the affiants, Jose Garcia, produced a videotape reflecting a trip to King's Dominion in which Cosio and A.A. are said to be shown interacting amicably.

10. According to the majority, "[t]he government could have argued, with some force, that a young girl truly afraid of her half-brother would have acted friendly toward him around his coworkers lest she suffer cruel reprisals from him later." This contention is unpersuasive, for the majority overlooks the uncontradicted testimony that A.A. *went out of her way* to be with Richard.

Roxanna Fuster. Erick Estrada recalled that A.A. and Cosio would "joke together"; "smile at each other"; and that A.A. would greet her brother affectionately with a kiss on the cheek. Mr. Villatoro testified that A.A. had a "friendly" relationship with Cosio and "always wanted to be with him," and would "put her arm ... over Richard's shoulder" when sitting next to him. A.A. never appeared nervous in Cosio's presence.[11]

The government's only witness at the hearing was Cosio's trial attorney. Counsel testified that he knew, from the government's *Drew* motion, see note 5, *supra,* that the government's principal explanation of A.A.'s failure to report the alleged abuse would be that A.A. feared reprisal from Cosio. He acknowledged that "the fear issue is an important issue." In spite of this, trial counsel did not direct his investigator to discuss with Cosio's co-workers at IDP the question whether A.A. ever acted in a way that suggested that she was afraid of Cosio. Rather, he directed the investigator to interview these individuals to determine whether they were potential character witnesses who could show that Cosio was a hard-working individual—a useful inquiry, perhaps, but one that was less essential to the defense than questions regarding the relationship between A.A. and Cosio would have been.

Trial counsel further testified that, about one month before the trial, he had suddenly been called away from Washington, D.C., to his native Texas following the tragic death of his brother-in-law in an automobile accident. Counsel had to stay in Texas for more than a week, and he did no substantial legal work during this period. After counsel's return, he filed a motion for a continuance of the trial, but his request was denied. Counsel explained

that he would have investigated the case further if his motion had been granted. He explained that much of his investigation had been done before he left for Texas, but that "sometimes you get the most important piece of investigative—defense investigation at the end."

At trial, the government emphasized A.A.'s alleged fear of Cosio, and the effect of that fear on A.A.'s readiness (or lack thereof) to disclose the alleged abuse, throughout its case: in its opening statement, in A.A.'s testimony, in Dr. Lindsay's testimony, and in the prosecutor's closing and rebuttal arguments. At the § 23–110 motions hearing, trial counsel was forthright about his failure to confront this issue adequately at trial, conceding that he did not present any testimony or evidence relating to the question whether A.A. was, or appeared to be, afraid of Cosio. Counsel also conceded that this issue was critical to A.A.'s overall credibility, and would therefore have been important to the defense case:

Q. I mean, wouldn't you say that if it could have been proven that, through witnesses, that they had a cordial, friendly, open public relationship, that that would have gone some distance in rebutting the picture of physical abuse and fear that [A.A.] had portrayed?

A. Yes.

  *   *   *   *   *   *

Q. "But ... you [did not] address the issue of whether or not she had a public appearance of being fearful of this man based on witness testimony, correct?

A. That's right.

---

11. There was also speculation among the co-workers that A.A.'s mother favored Cosio over her half-siblings, and that the siblings might make up a story against him out of jealousy.

Q. And indeed, it would be helpful for a closing argument—since closing arguments are, by necessity, arguments on evidence—to have evidence in the form of testimony, or anything else that is permissible, on the issue of whether or not there was a fear factor between her and Mr. Cosio, correct?

A. Correct.

Q. And that would not only throw into question the whole issue of her delay in disclosure, but also throw into question her credibility in that she had very forthrightly said she was afraid of him because of the beatings, correct?

A. Yes.

## B. *The judge's ruling.*

The trial judge denied Cosio's § 23–110 motion in a written order. According to the judge, trial counsel conducted a thorough investigation aimed at establishing a "fabrication" defense and developed a "coherent defense theory" based on Cosio's good character and A.A.'s relationship with Ledesma. In the judge's opinion, counsel did not regard the fear issue as an important one.[12] Therefore, the judge believed, trial counsel did not consider using the testimony of Cosio's coworkers to rebut the allegation that A.A. feared Cosio. The judge also concluded that A.A.'s fear of Cosio "was not critical to the government's case or a central theme," and was not a factor in A.A.'s silence from 1994 to 1997.[13] The judge further reasoned that if the coworkers' evidence at the § 23–110 hearing had

been presented at trial, "[t]he prosecutor could have used their testimony about how much A.A. seemed to like her brother and seemed to enjoy spending time with him to argue that she had no motive to fabricate a story against him." In other words, the judge opined, "[h]ad the defense strategy been different, the prosecution strategy would have been different as well"; the judge apparently believed that if defense testimony regarding the cordiality between A.A. and Cosio had been introduced into evidence, then the government's account of the role of fear in A.A.'s seven-year silence might have been different from what it was at the trial.

## IV.

## LEGAL ANALYSIS

### A. *Standard of review.*

On appeal, the trial court's determination whether counsel was ineffective presents a mixed question of law and fact. *Bowman v. United States,* 652 A.2d 64, 73 (D.C.1994); *Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992). The trial court's factual findings must be sustained unless they lack evidentiary support in the record. *See* D.C.Code § 17–305 (2001); Super. Ct. Civ. R. 52(a). The trial judge's legal conclusions are reviewed *de novo. Byrd,* 614 A.2d at 30; in particular, "we owe no deference to the trial court's legal conclusion as to whether counsel was deficient." *United States v. Little,* 851 A.2d 1280, 1288 n. 10, (D.C.2004). Because ineffective assistance of counsel claims impli-

12. Trial counsel's admissions, quoted in the text on pages 191–92, *supra,* appear to be flatly contrary to the judge's finding. Counsel did not conclude that the fear issue was unimportant. On the contrary, counsel did not detect the availability of evidence which would have enabled him to deal with it effectively.

13. This conclusion cannot, in my view, be reconciled either with A.A.'s testimony, as quoted in this opinion, or with the government's opening statement, closing and rebuttal arguments, and expert testimony.

cate a basic constitutional liberty, this court has recognized that "the standard-of-review calculus must take into account this important reality." *Frederick v. United States,* 741 A.2d 427 (D.C.1999); *see also Griffin v. United States,* 618 A.2d 114, 118 (D.C.1992) (discussing appropriateness of more searching appellate review where basic liberties are at issue). In my opinion, we should therefore examine the trial judge's decision more critically than it has been evaluated by the majority.

### B. *The substantive standard.*

The right to counsel secured by the Sixth Amendment protects a criminal defendant's fundamental right to a fair trial. *Gideon v. Wainwright,* 372 U.S. 335, 342–43, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Kimmelman v. Morrison,* 477 U.S. 365, 377, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). The defendant is entitled not merely to counsel, but to the *effective* assistance of counsel. *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052; *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). This right "may in a particular case be violated by even an isolated error of counsel if that error is sufficiently [serious]."[14] *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2678, 91 L.Ed.2d 397 (1986).

In order to prevail on a claim of ineffective assistance of counsel, Cosio must show that his trial counsel's performance was "deficient." He must demonstrate that his attorney's errors or omissions were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that counsel's ineffectiveness so prejudiced the defense "as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. The

court's "scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. 2052. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id* at 690, 104 S.Ct. 2052. But where counsel has made a choice not on the basis of strategic considerations, but because he failed to recognize that a different choice was available, substantially less deference is due. *Kimmelman,* 477 U.S. at 384–85, 106 S.Ct. 2574; *Chatmon v. United States,* 801 A.2d 92, 108–09 (D.C.2002).

Even if counsel's representation was deficient, Cosio must show that, but for trial counsel's errors, there is a "reasonable probability" that the result of the trial would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The "defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case." *Id.* at 693, 104 S.Ct. 2052. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Given trial counsel's effective acknowledgment that he did not recognize the significance of the "cordial relations" evidence that he failed to gather and use, the court's confidence in the outcome of the case has been, or at least ought to be, substantially undermined. Cosio may (or may not) be guilty, but the adversarial system has not worked in this case as it should have worked. As I see the case, Cosio is serving a very long sentence without the credibility of his accuser having been tested as it could and should have been.

### C. *Deficient performance.*

Cosio acknowledges that his attorney conducted an extensive pretrial investiga-

---

**14.** In *Murray,* the Court used the word "egregious." In my view, this adjective is overused in barristerial and, occasionally, judicial rhetoric, and I prefer a less derisive adjective.

tion, including interviews with Cosio's mother, brothers, sister E.H., friends, teachers, and coworkers. Cosio's allegation of deficient performance centers on one issue and one issue only—counsel's failure to contest the prosecution's theory (and A.A.'s testimony) that, for seven years, she did not reveal the alleged abuse by Cosio because she was afraid of Cosio. I agree with Cosio that this failure constituted ineffective assistance.

Counsel's error in not challenging the notion that A.A. feared Cosio may perhaps be characterized as "isolated," *Murray*, 477 U.S. at 496 106 S.Ct. 2639, 2678, but it was central to Cosio's defense. The case for the prosecution hinged on the credibility of Cosio's accuser. If A.A.'s credibility could have been undermined, then Cosio would have been far less likely to be convicted. Yet A.A. proclaimed her fear of Cosio, and her belief that he had persecuted her, while behaving, at least until she developed a relationship of some kind with Ledesma, as if she liked Cosio and was not afraid of him at all.

The principal difficulty with the government's case was that, for seven years, A.A. had failed to disclose to *anybody* the atrocious acts to which she had allegedly been subjected by her older half-brother.[15] The trial judge indicated in her order denying the § 23–110 motion that Mr. Ledesma may have been the first adult whom A.A. could trust, and that this was why she related to him allegations that she had not previously communicated to anyone else. There is, however, little if anything in the record to support this notion. Even if one discounts A.A.'s mother (with whom A.A. evidently had a difficult relationship), A.A. had substantial contacts with responsible adults to whom she could have complained of what was allegedly happening to her. There were the principal and instructors at Mount Ann Mission School; indeed, the principal of that institution testified as a prosecution witness at Cosio's trial. A.A. would surely not have been in danger of reprisal from Cosio if she had made her disclosure at a school located so far from Cosio's residence. There were also teachers and staff members at A.A.'s school in the District to whom A.A. could have reported the abuse. Moreover, A.A.'s sister, E.A., who is four years older than A.A., was eighteen years of age when A.A. was allegedly being abused at the age of fourteen. A.A. testified that she and E.A. were very close and that E.A. did not like Richard. A.A.'s failure to tell her older sister-confidante how their half-brother had been ruining her life was remarkable under the circumstances, and suggests, perhaps more strongly than A.A.'s failure to report Cosio's alleged conduct to others, that the abuse may not really have happened.

Obviously, at trial, the government and A.A. would have to account for A.A.'s fail-

---

**15.** The prosecutor argued unambiguously, during rebuttal, that A.A.'s fear continued to inhibit her from disclosing the alleged abuse during the period from 1994 to 1997, when she was eleven to fourteen:

> [PROSECUTOR]: ... Then when she came back, life went back to the way it was before. Mr. Cosio still ran the show.
> [DEFENSE COUNSEL]: Objection, Your Honor.
> THE COURT: Overruled.
> [PROSECUTOR]: (Continuing.) She was still scared of him. Her mother still agreed with everything he said. She felt she wasn't safe. She was eleven years old; he was twice her age. He was the man of the household. The abuse began again and the pattern picked up where it had left off.
> You can imagine the thoughts that were running through her mind, what will he do if he finds out. She was eleven years old at home alone living with this man. How could she have known what he would do to her if she had told?

ure to report the alleged abuse. The principal explanation, proffered both by the prosecutor and the complaining witness, was A.A.'s alleged fear of Cosio. Contrary to the trial judge's impression, and as I have demonstrated in this opinion, this was the prosecution's main explanation for A.A.'s silence during the "second round" of alleged abuse in the period 1994–97, as well as during the "first round" when A.A. was seven years old. Trial counsel knew from the prosecution's pretrial filings what the government's position vis-a-vis A.A.'s silence would be. Nevertheless, counsel did not investigate or address the possibility that A.A. was *not* afraid of her half-brother.

Perfect hindsight is not a rare commodity, and we, as appellate judges, must be careful not to expect an attorney to anticipate or detect, before a case is tried, facts or issues that only become apparent to us after we have had the opportunity to read the record and the briefs and ponder them long after the battle in the trial court is over. Nevertheless, and recognizing the "distorting effects of hindsight," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Brewer v. United States,* 609 A.2d at 1140, 1142 (D.C.1992), it should surely have been evident to Cosio's trial counsel that if A.A.'s proclaimed fear of Cosio could be shown to be false, then her credibility would be severely undermined. A.A.'s seven-year silence, attributed by her to fear, was potentially the prosecution's Achilles heel. If A.A.'s explanation for her silence could be successfully challenged, then the prosecution's case would be in serious difficulty.

Under these circumstances, counsel was obliged to determine whether there existed

a witness or witnesses likely to have information regarding the existence or non-existence of A.A.'s proclaimed fear. Investigation of this possibility was not difficult. Cosio himself must have known whether anybody had seen him and A.A. interact with one another; all trial counsel had to do was to ask Cosio.[16] The answer to an inquiry on this subject would have revealed the identities of Cosio's coworkers, and Cosio himself would doubtless have been able to apprise his attorney of A.A.'s unsolicited visits to his place of work and to describe her friendly behavior towards him there. Trial counsel would thus quickly have learned of A.A.'s wish to be around Richard, of her unsolicited visits to him, of the kisses she planted on his cheek, of her affectionate arm around his shoulder, and of her relaxed friendly behavior in his presence. The witnesses to all of this interaction proved to be available, and Cosio's § 23–110 (and present) counsel evidently had no difficulty in locating them or in eliciting the information that they were able to provide.

Cosio was entitled to a fair trial, not to a perfect one. He had a right to competent legal representation, not to the matchless barristerial defense that might be had from a modern-day Clarence Darrow. Whether counsel's failure to grasp that there were readily available areas of investigation through which he could test A.A.'s claim that she feared Cosio was *constitutionally* deficient performance is not an easy question. Examination of the record as a whole reveals that trial counsel made a serious effort to investigate the case, and that he framed a theory of defense, albeit one that left the main prosecution witness' credibility almost completely intact. Nev-

16. The majority's comment that coworkers would not ordinarily be expected to know much about a man's relationship with members of his family seems, at least on this record, to require very little in the way of resourcefulness from a defense attorney in a major felony case.

ertheless, counsel made a grave and potentially costly omission in his preparation and presentation. Difficult cases must be decided, and close calls should often be made in favor of the liberty of the citizen. *Cf. Watkins v. United States,* 846 A.2d 293, 296 (D.C.2004). I conclude that Cosio has satisfied *Strickland's* deficient performance prong.

### D. *Prejudice.*

If the evidence presented by successor counsel at the § 23–110 hearing had been discovered and utilized by Cosio's trial attorney, then the course of the trial would have been significantly different. Although it is never easy to divine what would have happened "if" events had developed differently—here, if the evidence rebutting A.A.'s claim that she feared Cosio had been available to the defense—the potential impact of that evidence, if effectively used, upon the trial and on its outcome would surely have been substantial.

The linchpin of the government's case was A.A.'s credibility. If A.A.'s testimony was not believed, Cosio could not be convicted. Common sense suggests that the witnesses to the evidently amicable relationship between Cosio and A.A. would have raised a serious question in the jury's mind regarding A.A.'s claim of fear, and even of her claim of abuse. Would a young teenager seek out, hug, and kiss the cheek of an adult man who has for years abused and tormented her in a most terrifying and exploitive way? Would she act in this manner vis-a-vis a man of whom she was afraid? Do not actions speak louder than words? If A.A. denied the affectionate conduct, her testimony would be at odds with that of four apparently fairminded witnesses. If she acknowledged

that their testimony was true, on the other hand, then where, the jury might well ask, was the fear that was supposed to account for A.A.'s seven-year silence?

A.A. might, of course, testify that she had no reason to fear Cosio *as long as she did not tell.* In other words, the two of them might theoretically have had the cozy and affectionate relationship described by Cosio's coworkers as long as she went along with, and did not report, the abuse. But this is not at all the scenario that emerged from the government's theory at trial. This case was not presented as one of "statutory rape" of a willing partner who was too young to give her legal consent. Rather, A.A. was depicted as a desperately unhappy girl, not as a youngster cooperating in an inappropriate romance. She testified that "I didn't like anything that was going on in my life," and that "I always wished my life would be like one of my friends or anything." Then, in a dramatic [17] ending to her testimony on direct examination, A.A. described her feelings towards Cosio.:

Q. How do you feel about your brother, Richard, right now?

A. I don't hate him.

Q. Why don't you hate him?

A. Because it says in the Bible, I don't remember the verse, but it said, "Again you have heard to love your neighbors and hate your enemies, but I tell you to *love your enemies and pray for those who persecute you.*"

(Emphasis added.) Thus, according to A.A., Cosio was *an enemy* who had *persecuted* her. This characterization would not have been easy to reconcile with the scene

---

17. Or, arguably, melodramatic; the record does not disclose whether or not A.A. was coached with regard to her invocation of the Bible, which prompted a defense motion for a mistrial.

at IDP depicted by Cosio's fellow-employees.

Moreover, the cross-examination of A.A. would no doubt have been quite different if trial counsel had possessed the information that successor counsel subsequently obtained. As previously noted, the transcript portrays A.A. as an intelligent and apparently sincere and credible witness. She was not significantly impeached. With the information provided by Cosio's coworkers available, the defense would have been in a position to contrast A.A.'s proclaimed emotions, and her explanation of her protracted silence, with her actions.[18] Nothing comparable to the questioning suggested in the preceding footnote was attempted at trial, nor could this have been done without the requisite in-

vestigation. It is, of course, possible that A.A. could have explained the apparent chasm between word and deed, but it is improbable, to say the least, that her credibility would have emerged as unscathed as it did at trial.

Further, in connection with *Strickland's* "prejudice" prong, the testimony of Cosio's trial counsel is especially significant. The hearing on the § 23–110 motion was an adversarial proceeding. Cosio's trial attorney was the only government witness. To the extent that deficient performance and prejudice were at issue, it was on the testimony of Cosio's trial counsel that the government depended in presenting its side of the case. But trial counsel acknowledged on the witness stand

---

**18.** It would not require an expert on cross-examination, which the author of this opinion most assuredly does not claim to be, to question A.A. along the following lines, and to elicit the following probable responses:

Q. Now, A.A., you testified that you never reported Richard's abuse in the efficiency apartment because you were afraid of him, correct?

A. Yes, and afraid that my mother wouldn't believe me.

Q. And then that Richard would learn of your accusation and would then hit you?

A. Right.

Q. And you did not tell the folks at Mount Ann Mission about what Richard had done because you were afraid?

A. True.

Q. And you testified that when you returned to the District, and he started abusing you again, and continued to abuse you for four years, you still did not report it because you were afraid?

A. Yes.

Q. You were close to your older sister, E.A., were you not?

A. Yes.

Q. And she disliked Richard?

A. True.

Q. And when you were fourteen, she was eighteen?

A. Yes.

Q. And you did not tell her what Richard had been doing, because you were afraid of Richard?

A. True.

Q. Now, you believed that Richard was persecuting you, but you testified that you forgave him?

A. That's right.

Q. And you were desperately unhappy about what he was doing, and you wanted to be happy like your friends?

A. Yes.

Q. Now, A.A., is it not true that you often visited Richard at work, even when you did not have to?

A. [Presumably] Yes.

Q. Did you not tell Roxanna Fuster that you were bored at home, and that you wanted to come to the office and hang around Richard?

A. [Presumably] Yes.

Q. Isn't it true that, on your visits, you kissed Richard on the cheek, and put your arm around him?

A. [Presumably] Sometimes.

Q. And Richard was the man who persecuted you and of whom you were afraid?

A. Yes.

Q. And he was the enemy whom you forgave?

A. Yes.

1. that testimony about the friendly relationship between Cosio and A.A. would have tended to rebut the picture of physical abuse and fear that A.A. had portrayed;
2. that [trial counsel] did not address the issue whether, in public, A.A. appeared afraid of Cosio or acted as if she was afraid;
3. that it would have been helpful at trial and in closing argument to have testimony negating the "fear factor" between A.A. and Cosio; and
4. that this information would have thrown into question not only the whole issue of A.A.'s delay in disclosure, but also her credibility regarding her claim that she feared Cosio.

These admissions on the part of trial counsel take Cosio a long way towards the showing of prejudice required by *Strickland*.

The majority suggests, as did the trial judge, that proof of friendly interaction between Cosio and A.A. would have undermined any claim that A.A. had a motive to fabricate.[19] I cannot agree. The alleged motive to fabricate did not arise until after A.A. began to associate with Mr. Ledesma in the autumn of 1997 and developed a crush on him, and after Cosio began to interfere with her relationship with Ledesma. Most of A.A.'s affectionate activity towards Cosio appears to have preceded A.A.'s visits to Mr. Ledesma. Those visits caused problems and tension between A.A. and Cosio that did not exist at the time of the affectionate activity. The evidence that A.A. liked being around Cosio, at least through the summer and early fall of 1997, tended to show that, at that time, she was neither afraid of him nor acting as though he were a rapist and abuser. The existence of the cordial relationship has far less bearing, however, on whether A.A. *subsequently* developed a motive to fabricate when she wanted to be with Mr. Ledesma and when Cosio tried to keep the two apart.

In any event, we must deal with reality here. If the coworker witnesses are to be believed, then the amicable atmosphere, unsolicited visits, kissing on the cheek and hugging did in fact take place. This reality presents us with two alternatives, one of which must necessarily be correct. Either

1. A.A. sought out the company of, and acted in an affectionate and friendly manner towards, a man who had abused and persecuted her and of whom she was extremely afraid; or
2. A few months later, A.A. made false and terrible charges against a man—a half-brother—to whom she had quite recently appeared to be friendly.

In other words, A.A. either, astonishingly, liked the company of an abuser and persecutor whom she swore that she feared, or, far less astonishingly, she falsely accused someone to whom, in public, she had long been very nice, but who was now trying to keep her from seeing the man on whom she had developed a crush, and on whom she had apparently become quite dependent. In my opinion, the trial judge and the majority significantly overstate the negative effect that the "affectionate relationship" evidence would have had on the "fabrication," *i.e.*, general denial, defense.

Most significantly, we are dealing here with a criminal case in which the prosecution must prove the defendant's guilt beyond a reasonable doubt. The government's case rested squarely on A.A.'s tes-

---

19. In reality, a "fabrication defense" is a euphemism for a general denial; "I did not do it, so she must have made it up."

timony, and if her credibility could be undermined, a conviction was improbable. But the opportunity to challenge A.A.'s credibility was lost, basically because its existence never occurred to Cosio's attorney. In my opinion, trial counsel's failure to obtain, present, and utilize the evidence available from Cosio's coworkers prejudiced Cosio's defense within the meaning of *Strickland.*

The majority suggests that, although Cosio's trial counsel failed to identify the availability of evidence that A.A. did not fear Cosio, a competent attorney who was aware of that evidence might have elected not to use it because, according to my colleagues, the "coziness" evidence might weaken the defense showing of a motive to fabricate. I do not agree. First, friendliness to Richard *before* the motive to harm him arose has little bearing on A.A.'s state of mind *after* he had interfered with her relationship with Mr. Ledesma. It is not at all clear to me that a reasonably competent attorney would give up evidence tending to undermine the accuser's credibility because the use of that evidence might marginally weaken the fabrication defense. The defense theory in this case had to be that A.A. falsely accused Cosio because, at the time of the accusation, she had a motive to do so. Her previous friendliness to him would tend to show that she did not have any such motive before her relationship with Mr. Ledesma, and would thus reinforce the inference that it was Cosio's attempt to keep A.A. from seeing Ledesma that precipitated her change of attitude.

Moreover, the majority's legal theory cannot be reconciled with our decision in *Chatmon,* a case in which we discussed and rejected the very argument my colleagues are making here:

> *Strickland* recognizes that there is a "wide range of reasonable professional assistance" and establishes a "strong presumption" that counsel has rendered adequate assistance. [*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052]. From this language we could conclude that our evaluation is an objective one: if counsel's action could be justified by a sound trial strategy, it should not be considered deficient, even if it was not defense counsel's actual trial strategy. *We are not persuaded that is the proper course here, however,* because "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. 2052. *Moreover, just as we do not burden counsel's actual tactical choices with the benefit of "tactics as disclosed by hindsight," [citations omitted], neither do we salvage them on that basis.* Analysis under *Strickland* is highly fact bound and the presumption created by *Strickland* is simply that, a presumption, that can be overcome by the facts in a particular case. *Therefore, once the record establishes the actual tactical explanation for counsel's actions, the government [or the court] is not free to invent a better-reasoned explanation of its own.*

801 A.2d at 108–09 (emphasis added).

In this case, the trial judge and the majority are attempting to do exactly what *Chatmon* forbids, namely, to "invent a better-reasoned explanation of [their] own" for trial counsel's failure to develop a defense, when, in reality, the sole reason for that failure was that this defense did not occur to counsel because he did not do the necessary investigation to lay the groundwork for it. Whether the defense attorney's "rationale" for his actions in *Chatmon* made more or less sense than trial counsel's failure in this case to grasp the key issue is beside the point; the court

cannot convert deficient performance into satisfactory representation by inventing an after-the-fact justification that Cosio's counsel never considered at all. In *Chatmon*, counsel at least made a tactical decision, albeit an unsound one; in this case, Cosio's attorney failed even to obtain the requisite information required to make a tactical decision. Given this failure, I am unable to agree with the majority's theory that a competent attorney might not have used the evidence of A.A.'s friendly and affectionate relationship with Cosio and that therefore Cosio's trial counsel was not ineffective.

## V.

### THE EXCLUSION OF THE 1993 MEDICAL RECORD

Cosio also appeals from the trial judge's decision to exclude from evidence the proposed testimony by the defense expert, Dr. John Adams, regarding a medical examination of A.A. in 1993, when she was ten years old. Cosio also challenges the exclusion of a record of that examination. The facts relating to this issue are detailed in the majority opinion, but I think it appropriate to add my own reasons for concluding that the judge's ruling was erroneous.

Dr. Adams was initially qualified as an expert, *inter alia*, with respect to the interpretation of medical records. Nevertheless, the trial judge disagreed with Dr. Adams' interpretation of the records which the defense sought to introduce in this case, and especially, with Dr. Adams' opinion that the physician who conducted the examination of A.A. would probably have visually inspected A.A.'s hymen during a "normal genital/urinary examination." A.A.'s hymen was found to be in normal condition, and the defense contended that this finding contradicted, or at least tended to contradict, A.A.'s claim that she had

been raped by Cosio when she was seven years old.

The judge's stated reasons for intervening in this issue and, effectively, taking over the presentation of testimony were, to put it mildly, unusual. As noted by the majority, the judge explained—outside the presence of the jury—that

1. "*as a mother of two daughters*," and
2. upon "*watching the faces of the women in this courtroom who are observing*,"

she was concerned that the expert's testimony "flies in the face of every experience" and of "common sense." The judge stated that she would not make a ruling based on what she described as "*this knowledge of mine*," but she concluded that further exploration of the issue was required.

The judge appeared to recognize, soon after having invoked her own knowledge as a mother, that she could not use her personal experience as a substitute for expert testimony. But the judge also apparently included in her calculus the perceived facial expressions of unidentified female spectators in the courtroom. These anonymous spectators may or may not have had some knowledge of the subject at hand, and they may or may not have intended to convey, by the looks on their faces, some view regarding Dr. Adams' testimony. These women had certainly not, however, been qualified as experts, and counsel for Cosio had no opportunity to cross-examine them. Perhaps the judge did not really mean to base her decision, in any significant measure, on the skepticism that she thought she saw on female faces in the courtroom, but the fact is that the quoted remarks led to the unusual sequence of events, set in motion by the judge, that culminated in the exclusion of Dr. Adams' proposed testimony regarding the 1993 examination of A.A.

At the judge's behest and direction, the prosecutor called Muriel Wolf, M.D., a Children's Hospital pediatrician, as a rebuttal witness. Dr. Wolf testified that visualization of the hymen during an examination such as that of A.A. was in line with her own personal practice as a pediatrician for some thirty years, and "not outside the protocol."[20] Dr. Wolf further testified—over a hearsay objection which the judge overruled without explanation—that she had spoken with a total of eleven doctors during the past two days regarding their practices, and had learned that

> they frequently would look at the genital area, look to see if there was hair, look to see whether the child approaches puberty, look to see whether the clitoris was enlarged. They would not *necessarily* pull the vulva apart and look at the hymen, and not necessarily look at the urethra.

(Emphasis added.) It was largely on the basis of what Cosio fairly characterizes as "wildly anecdotal hearsay" that the judge decided to exclude the medical record and Dr. Adams' testimony about it.

The government argues that the physician who performed the examination was not available and that Dr. Adams could not know whether that physician examined the hymen. But when the relevance of evidence is premised on the fulfillment of a condition of fact,

> the trial court neither weighs credibility nor makes a finding that the [proponent] has proved the conditional fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact ... by a preponderance of the evidence.

*Huddleston v. United States*, 485 U.S. 681, 690, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). In this case, Cosio argues that the medical record itself, together with the testimony of Dr. Adams and, to some extent, of Dr. Wolf, provided a basis from which an impartial jury could have found, by a preponderance of the evidence, that the 1993 examination of A.A. had included a visual examination of the hymen. At most, the collective wisdom of eleven anonymous physicians canvassed by Dr. Wolf, some of whom would not *necessarily* have visualized the hymen, went to the weight of Dr. Adams' testimony, not to its admissibility. *Ibn–Tamas v. United States*, 407 A.2d 626, 638 n. 23 (D.C.1979). Accordingly, I conclude that the 1993 medical record, as well as Dr. Adams' testimony about it, should have been admitted into evidence.

## VI.

### CONCLUSION

For the foregoing reasons, the order denying Cosio's § 23–110 motion should be reversed and Cosio should be granted a new trial. I apprehend, with more than a little dismay, that Cosio will have to serve thirty-three years to life because his trial counsel failed to use a golden opportunity to challenge and undermine the credibility of Cosio's accuser. Because, unfortunately in my view, my colleagues in the majority have reached a contrary conclusion, I must respectfully dissent.

---

**20.** Dr. Wolf testified:
> Personally, I usually will check the child in terms of genitalia, looking at the external genitalia, then moving to look at the hymen and the urethra. It's not always but usually we will do that.